**UNITED STATES of America,**
**Appellee,**

**v.**

**Joel Simon MEYERS, Appellant.**

**No. 267, Docket 32820.**

United States Court of Appeals
Second Circuit.

Argued Dec. 12, 1968.

Decided Jan. 28, 1969.

Thomas H. Baer, New York City (Alan H. Levine and Steven M. Roth, New York City, on the brief), for appellant.

Jerome C. Ditore, Asst. U. S. Atty. (Joseph P. Hoey, U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., on the brief), for appellee.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge:

Joel Simon Meyers (appellant) was convicted, after a two-day jury trial in the Eastern District of New York, of willful failure to report for and submit to induction in the armed forces of the United States, 50 U.S.C. App. § 462(a). The jury returned a verdict of not guilty on a companion charge of hindering and interfering, by force, violence and otherwise the administration of the Universal Military Training and Service Act. 50 U.S.C. App. § 462(a). The Court imposed a four year sentence and this appeal followed.

Appellant was registered with Local Board No. 35 in Brooklyn, New York. On September 13, 1966, after several student deferments, appellant was reclassified I–A. He did not appeal the classification. After successfully passing the physical examination, he was ordered to report for induction on May 4, 1967 and to complete and submit a "Statement of Personal History" to the induction center at that time.

The procedure followed at the Fort Hamilton, New York induction center where appellant was to report is to assemble the inductees in a control room where a pre-induction orientation is given. This orientation essentially consists of an explanation of what is to be done during the day. When orientation is completed, a roll call is taken and the inductees are given additional papers to fill out. Medical and mental tests follow. After each inductee is finished, he reports back to the control room where he has lunch. Thereafter the oath is given and the induction ceremony takes place. In due course, the inductees are given dinner and then sent by plane or train to their respective station destinations.

When appellant, carrying an overnight bag, arrived at Fort Hamilton at approximately 7 a. m. on May 4, 1967 he was sent to a control room where other inductees were located. Around 7:30 a. m. the enlisted man who ran the pre-induction orientation, Daniel M. Smith, entered the control room and discovered appellant handing out anti-Vietnam literature to the men assembled there. He requested appellant to refrain from distributing the literature while in the building. Appellant responded that he

had a constitutional right to give out the leaflets and that he was still a civilian and not subject to military control.

Meanwhile the situation in the room became somewhat disorganized and tense. The military police were called and they requested appellant to sit down. Their request was ignored. They asked appellant to accompany them to the Provost Marshal's office where they could talk things over. This request was also ignored. Tension in the room began to mount and the situation became menacing when some of the men threatened appellant.

Appellant then began shouting obscenities, becoming, in the words of one of the military police, "a little violent, throwing his hands [out], kicking and shouting." The military police seated him in the back of the control room, but he jumped up again. With this, more military police arrived and, after 45 minutes of disruption, removed him physically to the Provost Marshal's office.

Within fifteen minutes, the military police escorted appellant out of the Fort Hamilton gates where he was met by two people. According to one of the military police "they seemed to know each other, they patted him on the back and the three of them just turned around and waved and walked up the street."

Appellant did not take the stand nor did he offer any evidence in his own behalf. His first contention is that there was insufficient evidence to support a conviction of willful failure to report for and submit to induction. The only evidence, he asserts, shows his determination to express his views to his fellow inductees, in defiance of military personnel, which he argues is not inconsistent with an intention subsequently to submit to induction. He contends that his consequent failure to submit to induction was due to the action of the induction center personnel which prevented him from taking part in the induction ceremony.

In order to avoid ambiguity in refusals to submit to induction, appellant argues that special army regulations set out a clearly defined procedure whereby a registrant expressing an intent to refuse induction will first be given an opportunity to submit, then taken aside and explained the penalties for refusal and then given an opportunity to reconsider because the sanctions are severe. Army Regulations 601–270, § 40. See Chernekoff v. United States, 219 F.2d 721 (9th Cir. 1955); United States v. Hoffman, 137 F.2d 416 (2d Cir. 1943).

While conceding that "a registrant can so clearly manifest his intent to refuse prior to that stage so that unwillingness to submit to induction may be legitimately inferred" (Applt's Br., p. 17), appellant contends that such intent must be clearly expressed, which he asserts was lacking here. Where an inductee's intention is doubtful, the case law and the regulations are said to require that he be given a warning about the consequences of a refusal and a "last clear chance to change his mind." Chernekoff, supra, 219 F.2d at 725.

The Government's position, however, is that the evidence was sufficient to support an inference that appellant had a culpable intent not to submit to induction. We agree.

In the "Statement of Personal History" filed on the day of his induction at the center, appellant declared that "I refuse to participate in the genocidal war being waged by the U. S. government against the Vietnamese people." In the same document, he stated "The draft is an instrument of slave-labor. To submit to the draft is to risk one's life and to offer to serve as an accomplice to war crimes as defined in the Nuremburg agreements, which hold the individual responsible to refuse to cooperate in any way with such atrocious acts."

These statements, his activity in distributing leaflets, his refusal to comply with reasonable requests by induction personnel to halt so that the induction process could proceed, which refusal led to a disruption of those procedures, and the welcome he received from waiting friends on his expulsion from Fort Hamilton, taken together,

sufficiently indicate that appellant had an intent not to submit to induction.

Appellant's second contention is that the prosecutor's remarks to the jury on summation were improper because they allegedly gave the impression that if the jury acquitted, appellant would "beat" his draft obligation.

The Government in its summation stated in relevant part:

The question is did he intend to go into the Army, did he intend to do that on May 4th, and what about after May 4th? Is that it, is his obligation over?

Well, if you find that his obligation was over, then this was a pretty good game, very good, well planned.

\* \* \* \* \* \*

Now, this jury is being asked to further this scheme and say that this is fine. Mr. Meyers, you didn't have to go there, they threw you out, that is it, enjoy yourself, go back to Buffalo University, the State University, go back to City College, you don't have to obey the government's orders although you are I–A, you are an exception. Of course, you also had it in mind to go down and get yourself placed in a position where you have an interesting defense to an obvious crime, an obvious crime.

We ask you to listen to the law as charged by His Honor. It is the law which will be given to you, and which we say the Grand Jury has charged has been violated.

The law is contained in a book, it is just a book. It is like any other book. There is a difference, there is our law and his law. It binds us all.

We ask that you give careful attention to His Honor and to all the exhibits which will be made available to you.

And we ask that you don't say, Okay Mr. Meyers, you beat it, nice job.

You have a duty to fulfill.

We charge he didn't fulfill his duty, but you have a duty, and we ask that you find that the government has proved charges against this defendant.

Thereafter, appellant's counsel objected to the summation and moved for a mistrial.

■ The quoted portion of the prosecutor's statements do not clearly imply that appellant would permanently avoid the draft if acquitted. By stating that Meyers deliberately placed himself in a position where he had an interesting defense to an obvious crime, the prosecutor was merely dramatizing the obvious point that if acquitted, appellant would not have to go to jail. The summation does not constitute grounds for reversal.

The appellant also contends that the trial court's use of the "Allen Charge," Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), was unnecessary and coercive because the trial was only a day and a half and the jury had deliberated for only a short time. The record shows that the jury retired to deliberate at 11:40 a. m. on the second day of trial. The jurors went to lunch at 12:50 p. m. and returned at 2:30 p. m. Sometime around 4 o'clock the judge received a note that the jury was deadlocked 11 to 1 for conviction, and he ordered them back to the courtroom where he stated:

Members of the jury, I have received your message that you are deadlocked.

It is desirable if a verdict can be reached that this be done both from the viewpoint of the defendant and the government, only, however, if the verdict reflects the conscientious judgment of each juror and under no circumstances must any juror yield his conscientious judgment.

This Court has no purpose to ask and indeed does not have the right to inquire as to how you stand. But considering the length of the trial, the amount of testimony that was taken, the number of witnesses that have been heard and the prospect of another trial before another jury chosen in the same manner as you have been selected, if you fail to agree, further consideration on your part is fully justified.

You have only been deliberating, as I gather it, less than two hours, and I do not consider that is a sufficient length of time to permit you a full and fair opportunity to review the evidence and discuss and consider amongst yourselves the various phases of the evidence.

I want to read you the substance of a statement contained in a United States Supreme Court opinion which is generally known to the Bench and Bar as the Allen Charge.

The Court then read from Allen v. United States, supra, affirming in conclusion that it wanted the "Members of the Jury, to continue your deliberations."

At 4:30 p. m. the jury informed the Court that it had reached a verdict; guilty on the first count (failure to report for and submit to induction) and not guilty on the second count (interfering with the administration of the selective service act).

The judge's warning that "under no circumstances must any juror yield his conscientious judgment" makes the use of the Allen charge proper and not coercive. United States v. Kenner, 354 F.2d 780 (2d Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966). The fact that the judge knew that there was a lone dissenter does not make the charge coercive inasmuch as the nature of the deadlock was disclosed to the Court voluntarily and without solicitation. See Bowen v. United States, 153 F.2d 747 (8th Cir. 1946). To hold otherwise would unnecessarily prohibit the use of the Allen charge in circumstances where the judge was made aware of the numerical division of the jurors, for example, by an over-zealous juror, although he had not made the forbidden inquiry himself.

Appellant next contends that the District Court erred in admitting high-ly inflammatory statements of his political beliefs contained in the "Statement of Personal History" noted above. Their admission was not error, however, because they were relevant to the question of intent. While defense counsel objected to the admission of these statements, no cautionary instruction was requested at the time they were admitted and none was given. Any possible error by the Court in not giving such an instruction was cured by the charge when the judge told the jury "to eliminate from consideration the political opinions of the defendant other than the question of intent." In addition, we note in passing that the prosecutor affirmed in his summation that Meyers' views had "nothing to do with it, he is entitled to them. His views are only important on the question of his intent."

We have considered the other points raised by appellant's counsel, including the adequacy of the charge with respect to the elements of the crime and on the issue of intent, and find they are without merit.

The decision below is affirmed.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent. While it is true that the "Statement of Personal History" indicates that when Meyers made it out he had no intention of entering the service, the fact remains that he never was given the chance. He did report, with his overnight bag, and was entitled to an opportunity to change his mind and take the oath before being charged with a refusal to submit to induction.

In addition, I think the Allen charge was uncalled for in the circumstances of this brief trial and was necessarily coercive here, since the lone dissenter presumably knew that the judge had been informed that only one juror was holding out for acquittal.